# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-CA-00446-SCT

*GRAND LEGACY, LLP AND GRAND LEGACY OF MISSISSIPPI, LP*

*v.*

*CHARLES M. GANT, INDIVIDUALLY; STEPHEN L. SHIVERS, SR., INDIVIDUALLY; AND GANT & SHIVERS, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/10/2010 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS, JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | DAVID C. DUNBAR |
| | GROVER CLARK MONROE, II |
| ATTORNEYS FOR APPELLEES: | JOHN MICHAEL HERKE |
| | DONALD C. DORNAN, JR. |
| | TIM C. HOLLEMAN |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 07/28/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1. This case involves the duties owed among members of partnerships and claims of fraud. Charles M. Gant possessed a letter of intent to purchase property. He offered to sell the property to Grand Legacy, LLP ("Grand-LLP"), once he completed the purchase. Grand-LLP responded to the offer by agreeing to purchase the property through an unnamed partnership entity with Gant that was to be formed at a later date. Gant & Shivers, LLC, (as a limited partner) and Grand Legacy, LLP (as the general partner), signed a limited-

partnership agreement on March 23, 2005, forming Grand Legacy of Mississippi, LP, ("Grand-Miss LP"). After the purchase, Grand-Miss LP would develop the land. Grand-LLP and Grand-Miss LP ("Grand parties") claim that Gant stated he would not profit from the purchase and resale. The Grand parties argue that a partnership was formed on that date, and that the Gant parties (including Gant, his partner, Stephen L. Shivers, and their company, Gant & Shivers, LLC ("Gant-Shivers")) had a duty to disclose their intent to profit on the transaction, and that, in failing to disclose the intent to profit, the Gant parties committed fraud. The Gant parties counter that the sales contracts were integrated agreements that contain no clauses prohibiting different purchase and resale prices. Further, the Gant parties argue that an acknowledgment agreement, signed at closing by Grand-LLP, revealed that the price would be different and that the difference (profit) would be disbursed to Gant-Shivers. We affirm the trial court's grant of summary judgment in favor of the appellees.

## FACTS

¶2.     Orange Grove Utilities ("OGU") owned approximately 104 acres of waterfront property in Gulfport. On October 25, 2004, OGU and Gant committed by letter of intent for the sale of the property by OGU to Gant for $100,000 per acre. The letter included a clause prohibiting disclosure of the purchase price. J. Scott Sanders, the managing partner of Grand-LLP, expressed an interest in the property. Sanders and Gant had been involved in another land transaction in the summer of 2004, after being introduced to each other by an attorney, Jay Jordan. Sanders had extensive real-estate experience. Grand-LLP is a Florida-based entity, claiming on its website to be one of that state's fastest-growing acquisition

2

companies, with projects under development in eight states and "the strength to obtain favorable financing within weeks on land parcels valued at up to $100,000,000."

¶3. After the OGU-Gant letter of intent had been signed, but before a sales contract was completed, Gant took Sanders and one of Sanders's business partners, Dr. Duane Pankratz, on a boat ride to view the property. Shivers was not present, as he was out of the country at the time. While on the boat, Sanders agreed to purchase the property, if Gant would agree to become a member of a limited partnership with Grand-LLP to own and develop the property. They agreed on a sales price of approximately $15 million, with Gant to have a thirty-percent interest in the to-be-formed limited partnership. Sanders later stated that he believed, based on his expertise in local real estate, that $15 million was a fair price for the property. Sanders and Pankratz claim that Gant told them he had the property "locked in" and that Gant had agreed to buy it for approximately $15 million, but that he could not tell them the exact price because of a confidentiality agreement. They say Gant stated that he would not profit on the sale, but that he would profit only on the "back end," as an equity partner in the to-be-formed unnamed limited partnership. Gant denies saying he would not make a profit and claims that Sanders and Pankratz never asked how much he would be paying OGU.

¶4. On November 10, 2004, Gant and OGU signed a sales contract ("11-10 Agreement") with the sale price of $100,000 per acre. The agreement included the following confidentiality clause:

> PURCHASER . . . AGREE[S] NOT TO DISCLOSE TO ANY PARTY, THE
> PURCHASE PRICE PAYABLE HEREUNDER . . . .
> NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED

3

HEREIN . . . PURCHASER MAY DISCLOSE THIS CONTRACT AND THE TERMS THEROF TO . . . *LENDERS AND INVESTORS* IN CONNECTION WITH THE ACQUISITION OF THE PROPERTY.

(Capitals in original; italics added.)

¶5. Two days later, Gant and Grand-LLP signed a sales contract ("11-12 agreement"). The sales price was $144,231 per acre. Gant was the seller. The purchaser was "a Limited Partnership to be formed between Grand Legacy [LLP] and Charles M. Gant." The contract was subject to two contingencies: (1) Gant's acquisition of the property, and (2) formation of a limited partnership "MUTUALLY ACCEPTABLE TO BOTH SELLER AND PURCHASER." (Emphasis in original.) The 11-12 agreement included a confidentiality clause identical to the one in the 11-10 agreement.

¶6. Other than the differences noted (price, identity of sellers and purchasers, and contingencies), the two contracts mirrored each other. Both were drafted by Jordan. Neither contract prohibited different sales prices or the making of a profit. The contracts included the following identical merger clauses:

> This agreement constitutes the entire agreement between the parties hereto and, unless specified otherwise herein, no representation, inducement, promises, or prior agreements, oral or written, between the parties, or made by any agent on behalf of the parties or otherwise, shall be of any force and effect.

¶7. The 11-12 agreement was amended in February 2005 after being reviewed by Grand-LLP's attorneys in Florida. Jordan applied to the Mississippi Secretary of State for certification of limited-partnership status for the newly formed entity that would purchase the property, Grand-Miss LP. On March 22, 2005, the certificate was granted. By this time, Shivers had returned to Gulfport. On March 23, 2005, Gant, Shivers, and Sanders (as

4

managing partner of Grand-LLP) signed the limited-partnership agreement that had been drafted by Jordan. The partners were Grand-LLP as general partner and Gant-Shivers as limited partner.

¶8.    Subsequently, the limited-partnership agreement was amended, making SOJ Properties, LLC, (including Jordan and his law partners) a limited partner with a seven-percent interest. On April 1, 2005, the 11-12 agreement again was amended, making Gant-Shivers the seller, and Grand-Miss LP the purchaser. On April 12, 2005, Gant, Shivers, and Sanders signed an Acknowledgment and Waiver in which they recognized that Jordan and his firm, Schwartz, Orgler, and Jordan, PLLC ("SOJ Law"), had provided services and had attorney-client relationships with "Gant & Shivers, Sanders, and Grand Legacy." The parties agreed that SOJ Properties' share was fair and reasonable. They acknowledged that they had been advised by SOJ Law and its members "to seek independent counsel relative to this transaction and that the parties [had] sought such independent counsel or [had] waived the same . . . ." The parties acknowledged that SOJ Law would continue to have attorney-client relationships with them (individually and collectively), and waived any conflicts inherent in having SOJ Properties own an interest while its members provided legal services for the partnership and its members. Simultaneous closings of the two sales were planned for April 15, 2005. Grand-Miss LP obtained a bank loan for approximately $9.6 million, and Grand-LLP was to provide the remainder of the funding.

¶9.    Sanders claims that he told Jordan that he was not interested in the deal unless the new limited partnership was buying the property at the same price Gant was paying OGU. Sanders claims that Jordan told him the two contracts would mirror each other. Jordan

5

recalls it quite differently. Jordan testified that Sanders asked about sales prices, but that he told Sanders he could not divulge the price because of the confidentiality agreement. Jordan said he told Sanders to talk to Gant.

¶10. On April 15, 2005, Sanders, Gant, and Shivers signed the closing documents, as well as an Acknowledgment Agreement prepared by Jordan. The agreement referred to the confidentiality clauses in the sales contracts and included two paragraphs indicating that a difference in purchase prices would be disbursed to Gant-Shivers, as follows:

> WHEREAS, Grand Legacy of Mississippi, LP, by and through, Gant & Shivers, LLC, its limited partner and Grand Legacy, [LLP], its General Partner acknowledge that both the initial purchase by Gant & Shivers, LLC, from the initial Seller; and the purchase by Grand Legacy of Mississippi, LP, from Gant & Shivers, LLC, will be simultaneous closings but both purchases have confidentiality clauses in the contracts that prohibit disclosure of the terms of the purchases; and

> WHEREAS, Grand Legacy of Mississippi, LP, is obtaining a [bank loan for approximately $9,600,000] to Purchase property from Gant & Shivers, LLC, with said funds also being authorized by [the bank] to be used for the initial purchase of the property by Gant & Shivers, LLC; and

> WHEREAS, [Sanders] of Grand Legacy, LLP, . . . has agreed to contribute . . . the balance of the funds . . . , with said funds also being used to fund the initial purchase . . . ; and

> WHEREAS, Grand Legacy, LLP, . . . and Gant & Shivers, LLC, . . . acknowledge that *on both closing statements the funds shall be shown as a loan from Grand Legacy of Mississippi, LP, but that no note and Deed of Trust are being executed* as the closings are simultaneous and *the difference in the initial Purchase Price paid by Gant & Shivers, LLC, and the purchase price paid for by Grand Legacy of Mississippi, LP, shall be disbursed to Gant & Shivers, LLC.*

> NOW THEREFORE, . . . the parties acknowledge and agree as follows:

> . . .

6

[A bank will loan Grand Legacy approximately $9,600,000], with the balance of the funds being funded by Grand Legacy, LLP . . . and that said loan and funds shall be used to fund both closings with the *difference in the purchase price in the purchase price* [sic] *being paid to Gant & Shivers, LLC*, . . . .

(Emphasis added.) Sanders testified by deposition that the acknowledgment agreement was a separate document that "was handed to [him] in a stack of other documents . . . ." and that he signed it without reading it. He claims the document was added at the last minute without explanation. He acknowledged that he would have been given time to read it and that, if he had, he would have been informed of the purchase-price differences.

¶11. A settlement statement ("HUD-1") was prepared for each transaction. The gross amounts due in the first and second sales were $10,110,000 and $14,580,000, respectively. Gant-Shivers received a check for approximately $4,470,000 from SOJ Law's trust account. Gant-Shivers then disbursed $2,100,000 each to Gant and Shivers, individually. The Grand parties claim that they first learned in October 2007, nearly two-and-a-half years later, that the Gant parties had profited from the transactions.

## PROCEDURAL HISTORY

¶12. In April 2008, the Grand parties filed a complaint against Gant, Shivers, Gant-Shivers, and the three attorneys. Seeking disgorgement and punitive damages, they alleged fraud, fraud in the inducement, breach of fiduciary duties, negligent misrepresentation, gross negligence, and violation of the implied covenant of good faith and fair dealing. The attorney defendants settled and were dismissed.

7

¶13.    In November 2009, the Gant parties moved for summary judgment.  Shivers filed a separate summary judgment motion in his individual capacity.  The trial court heard argument in January 2010, and both motions were granted in February 2010.

¶14.    In granting the first motion, the trial court noted that the 11-12 Agreement contained no clause prohibiting Gant, individually, or Gant-Shivers, from making a profit on the transaction, and that the merger clause specifically prohibited reliance on any oral representations not included in the contract.  Further, the trial court noted that the acknowledgment agreement, signed by Sanders, stated that the difference between the purchase prices would be "disbursed to Gant & Shivers, LLC."  The trial court relied upon *Davis v. Paepke*, 3 So. 3d 131 (Miss. Ct. App. 2009), and found that, "[i]f Sanders had read the acknowledgment agreement, he would have seen the phrase instructing that" the price difference would be disbursed to Gant-Shivers.  *See id.* at 139.  Finally, the trial court took into account Sanders's extensive real-estate experience, finding that "if Sanders was relying on Gant's oral representation in his decision to enter into a $15 Million contract, it seems as though Sanders would have made sure that the contract contained a provision referencing such."  Although the trial court included in its findings that the plaintiffs claimed the existence of a fiduciary relationship, the effect of such a relationship was not analyzed.

¶15.    In granting Shivers's separate motion, the trial court found that the evidence was undisputed that he never made any representations about the property and was not present at the time the plaintiffs allege that Gant made false representations.  Further, the trial court found that Shivers had not acted individually, but only as a member of Gant-Shivers.  Thus,

8

Shivers could not be held individually liable. *See* Miss. Code Ann. § 79-29-305 (Rev. 2009).

The Grand parties appeal the grant of both motions.

## ISSUES

¶16.   The issues are:

    I.    Whether the trial court erred in finding no genuine issue of material fact regarding the fiduciary duties owed to a partner.

    II.    Whether the trial court erred, as questions of fraud are inappropriate for disposition at the summary judgment stage.

    III.    Whether the trial court erred in granting Shivers's separate motion, as he can be held individually liable.

## ANALYSIS

¶17.   A trial court's grant or denial of summary judgment is:

> reviewed by this Court de novo. *See* **Wilner v. White**, 929 So. 2d 315, 318 (Miss. 2006).   Mississippi Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). . . .   In this Court's de novo review, "[t]he evidence must be viewed in the light most favorable to the party against whom the motion has been made." **Daniels v. GNB, Inc.**, 629 So. 2d 595, 599 (Miss. 1993).

**Kilhullen v. Kansas City S. Ry.**, 8 So. 3d 168, 175-76 (Miss. 2009) (emphasis in original).

    **I.**    **Whether the trial court erred in finding no genuine issue of material fact regarding the fiduciary duties owed to a partner.**

¶18.   The Grand parties argue that a general partnership existed from the time of the meeting on the boat when the parties agreed upon their intent to form a partnership.  Preliminarily, they argue that Gant violated the duties of a general partner by claiming falsely at that time that he had agreed to purchase the property for approximately the same price that he would

9

sell it. The complaint by the Grand parties alleged not only that Gant had actively engaged in a misrepresentation from the beginning, but alleged also that the Gant parties had a duty to inform their partners of their plans to profit at the partnership's expense and had violated that duty by their silence.

¶19. They argue further that the 11-12 agreement, with its agreement to form a limited partnership, provides additional proof of the existence of a general partnership, as it evidences intent, the most important factor in determining the existence of a partnership by operation of law. *See Allied Steel Corp. v. Cooper*, 607 So. 2d 113, 117 (Miss. 1992). However, the other two factors (control and profit-sharing) did not exist at that time. *See Smith v. Redd*, 593 So. 2d 989, 993-94 (Miss. 1991). Further, as this alleged conversation involved an agreement to transfer real property, the statute of frauds would require a writing. *See* Miss. Code Ann. § 15-3-1(c) (Rev. 2003). At least one court has found that, even for the formation of a partnership, which may otherwise form by the operation of law, the statute of frauds requires a writing for a partnership involving the transfer of land. *See E. Piedmont 120 Assocs., L.P. v. Sheppard*, 434 S.E.2d 101, 102 (Ga. Ct. App. 1993).

¶20. The 11-12 agreement, which reduced to writing an intent to form a limited partnership in the future, did not create a general partnership. The parties were not yet carrying on the operation of a business as co-owners. It was not until the requirements of the Mississippi Limited Partnership Act were satisfied, including the filing of a limited-partnership certificate in the office of the Secretary of State, and the parties' expected limited-partnership agreement, that a limited partnership was formed. *See* Miss. Code Ann. §§ 79-14-101 to 79-14-1107 (Rev. 2009).

¶21.   The limited partnership came into existence in March 2005 as certified by the Secretary of State.   Partners in a limited partnership are governed by the statutes of the Mississippi Uniform Partnership Act regarding areas not covered in the Mississippi Limited Partnership Act.  *See* Miss. Code Ann. § 79-14-1107 (Rev. 2009).  Partners have duties of loyalty and care toward each other.  *See* Miss. Code Ann. § 79-13-404(a) (Rev. 2009).  Under the law in effect at the time of these transactions, partners had an additional duty, as follows:

> Every partner must account to the partnership for any benefit, and hold as trustee for it *any profits* derived by him without the consent of the other partners *from any transaction connected with the formation*, conduct, or liquidation of the partnership or from use by him of its property.

*See* Miss. Code Ann. § 79-12-21 (Repealed 2007) (emphasis added).  *See **Corley v. Ott***, 485 S.E.2d 97, 98-99 (S.C. 1997) (applying that State's counterpart to Mississippi's former law in a case with similar facts). The Grand parties submit that the price-difference language in the acknowledgment was insufficient fulfilment of the Gant parties' duty to the partnership.

¶22.   The Gant parties argue that they cannot be found to have failed to disclose their intent to profit, as Sanders signed the acknowledgment agreement that declared that there would be a difference in prices and that the difference would be paid to Gant-Shivers.  Citing ***Davis v. Paepke*** and a recent decision of this Court, the Gant parties rely on a contracting party's obligation to read a contract before signing or be found imputed with the knowledge of its contents.  *See **Mladineo v. Schmidt***, 52 So. 3d 1154, 1161-62 (Miss. 2010) (insureds have a duty to read insurance policies and will be imputed with the knowledge of the policies' provisions); ***Davis***, 3 So. 3d at 138-39.  This Court has stated that allowing a contracting party "'to admit that he signed [a contract] but did not read it or know its stipulations would

11

absolutely destroy the value of all contracts.'" ***Busching v. Griffin***, 542 So. 2d 860, 865 (Miss. 1989) (quoting ***Alliance Trust Co. v. Armstrong***, 185 Miss. 148, 163-64, 186 So. 633, 635 (1939)).

¶23. The trial court's order focused on (1) the merger clause, declining to consider parol evidence of alleged misrepresentation predating the contract; and (2) the acknowledgment agreement and the imputation of knowledge of its contents, regarding disclosure to partners. The trial court found Gant-Shivers LLP fulfilled its duty of disclosure when the acknowledgment was presented for signature, revealing that monies were to be paid to Gant-Shivers for the difference in purchase prices. Our *de novo* review identifies no error in the judge's ruling.

¶24. Whatever the parties said on the boat, the merger clause left such statements without any force and effect. This Court has stated that merger clauses are used "to signal to the courts that the parties agree that the contract is to be considered completely integrated . . . . [T]hus the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations . . . ." ***B.C. Rogers Poultry, Inc. v. Wedgeworth***, 911 So. 2d 483, 490 (Miss. 2005) (quoting ***Security Watch, Inc. v. Sentinel Sys., Inc.***, 176 F. 3d 369, 372 (6th Cir. 1999)). If Sanders wanted to hold Gant to this representation, he could have insisted on its inclusion in the 11-12 agreement, the limited-partnership agreement, or the closing documents, or he could have demanded to know the difference in purchase prices when presented with the acknowledgment. Grand failed to avail itself of any of the aforementioned.

¶25.	We agree that when the limited partnership was formed, fiduciary duties arose. Omission or concealment of a material fact can constitute fraud. ***Rankin v. Brokman***, 502 So. 2d 644, 646 (Miss. 1987). Where a fiduciary relationship exists, silence may be fraud. The "silence must relate to a material fact or matter known to the party and as to which it is his legal duty to communicate to the other contracting party." ***Mabus v. St. James Episcopal Church***, 884 So. 2d 747, 762-63 (Miss. 2004) (citing ***Guastella v. Wardell***, 198 So. 2d 227, 230 (Miss. 1967)). The confidentiality agreements did not prevent Grand-LLP from inquiring of the Gant parties the purchase price, whether as partner, lender, or investor in connection with the acquisition of the property.

¶26.	However, no admissible evidence supports that a price difference was concealed. The acknowledgment agreement unequivocally informed Grand-LLP that the sales prices were different and that the difference would be disbursed to Gant-Shivers. We can discern no error by the trial judge in imputing knowledge of the price difference to the Grand parties. It was incumbent upon Grand-LLP to read the contract before signing. Grand-LLP could have questioned the Gant parties about the amount of the difference revealed in the disclosure and also could have, as a lender and investor, insisted upon seeing the documents for the first purchase and sale as provided in the confidentiality clause. The trial court properly relied on ***Davis v. Paepke***, a case in which a contracting party violated a contract he had signed without reading, and subsequently attempted to rely upon prior representations not included in the contract. *See **Davis***, 3 So. 3d at 133-34. The acknowledgment informed the Grand parties that the prices were different and that the difference would be disbursed to Gant-Shivers. The Grand parties offer no admissible evidence to support concealment, as a cursory reading of

13

the acknowledgment would have revealed just the opposite. Thus, the trial court correctly discerned that no genuine issue of material fact existed as to that issue.

> **II.      Whether the trial court erred, as questions of fraud are inappropriate for disposition at the summary judgment stage.**

¶27.   "This Court has also alluded to the notion that cases which involve issues of contractual ambiguity and interpretation as well as allegations of fraud or misrepresentation generally are inappropriate for disposition at the summary-judgment stage." ***Great S. Nat'l Bank v. McCullough Envtl. Servs., Inc.***, 595 So. 2d 1282, 1289 (Miss. 1992) (citing ***Pursue Energy Corp. v. Perkins***, 558 So. 2d 349, 354 (Miss. 1990)). However, the standard of review of the grant of summary judgment regarding allegations of fraud remains the familiar genuine-issue-of-material-fact standard quoted above. *See* Miss. R. Civ. P. 56(c); ***Holland v. Peoples Bank & Trust Co.***, 3 So. 3d 94, 98-99 (Miss. 2008); ***Smith v. Chhabra***, 54 So. 3d 877, 880 (Miss. Ct. App. 2011). As the 11-12 agreement was integrated and unambiguous, parol evidence of an earlier representation would be inadmissible. Thus no admissible evidence created a genuine issue of material fact.

¶28.   We find no error in granting summary judgment under the circumstances specific to this case, as no admissible evidence supported claims of fraud in the inducement. The Grand parties attempted to introduce evidence from the boat-inspection conversation and similar conduct in an unrelated transaction. The remaining claims of fraudulent conduct were contracts and closing documents either adopted and executed, or unread and executed, by Grand. *See* ***Wedgeworth***, 911 So. 2d at 490; ***Davis***, 3 So. 3d at 133-34.

> **III.      Whether the trial court erred in granting Shivers's separate motion, as he can be held individually liable.**

14

¶29.   The trial court found that it was undisputed that Shivers was not present at the time of the alleged misrepresentations on the boat and that there was no evidence of him acting as an individual, but only as a member of Gant-Shivers.  Thus, citing Mississippi Code Section 79-29-305 (Rev. 2009), the trial court granted the motion, as Shivers could not be held individually liable.

¶30.   The Grand parties make three arguments: (1) As an individual member of the general partnership discussed above, Shivers had an individual duty to disclose; (2) the limited-liability-shield statute is inapplicable to an LLC member's own acts or omissions; and (3) the corporate veil may be pierced when fraud is involved.

¶31.   Even assuming that a general partnership arose by operation of law, Shivers was not a partner.  Shivers's involvement in this matter began when Gant-Shivers became a limited partner in Grand-Miss LP.  The Grand parties argue that Shivers's signature on the allegedly false HUD-1 statement should subject him to individual liability.  However, that statement was not signed until April 15, 2005, after the limited partnership had been formed.  At that time, Shivers was a member of Gant-Shivers, a corporate limited partner in Grand-Miss LP.

¶32.   The Grand parties argue that the trial court erred in applying the limited-liability-shield statute to these facts.  *See* Miss. Code Ann. § 79-29-305(1), (2) (Rev. 2009).  It provides:

> (1) A person who is a member of a limited liability company is not liable, by reason of being a member, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the limited liability company, whether arising in contract, tort or otherwise or for the acts or omissions of any other member, manager, agent or employee of the limited liability company.

(2) A member of a limited liability company is not a proper party to a proceeding by or against a limited liability company, by reason of being a member of the limited liability company, except:

(a) Where the object of the proceeding is to enforce a member's right against or liability to the limited liability company; or
(b) In a derivative action brought pursuant to Article 11 of this chapter.

*Id.* The Grand parties cite decisions of other courts in the argument that individual liability is a possibility for a limited-partnership member's own acts or omissions.[1] The **Gunnings** and **Causey** courts applied state statutes that are different from Mississippi's statute, in that they except a person's "own acts or conduct." **Gunnings**, 2007 WL 1931291, at *6; **Causey**, 2005 WL 2000625, at *5. **Handy** is factually dissimilar in that an LLC member was found individually liable for actions taken before formation of the LLC. *See* **Handy**, 2000 WL 364199, at *4. Here, all of Shivers's actions occurred after the formation of Gant-Shivers. **Clement** supports Shivers's position. **Clement**, 881 So. 2d at 974-75. Applying a statute identical to Mississippi's, the **Clement** court held, "The mere act of signing the contract on behalf of [an LLC] in his capacity as a member did not make [the LLC's manager and sole member] a signatory to the contract in his individual capacity." *Id.*

¶33. Finally, citing cases from other courts, the Grand parties argue that, when fraud or misrepresentation are involved, the veil of an LLC may be pierced.[2] The **Young** court stated

---

[1] **Gunnings v. Internet Cash Enter. of Asheville, LLC**, 2007 WL 1931291, *6 (W.D. N.C. July 2, 2007); **Causey v. Dipak Lachmandes**, 2005 WL 2000625, *5 (M.D. Tenn. Aug. 18, 2005); **Clement Contracting Group, Inc. v. Coating Sys., L.L.C.**, 881 So. 2d 971 (Ala. 2003); **Pepsi-Cola Bottling Co. of Salisbury, Md. v. Handy**, 2000 WL 364199, *4 (Del. Ch. Mar. 15, 2000).

[2] **Young v. Hamilton**, 92 Fed. Appx. 389 (9th Cir. 2003); **Vertrue, Inc. v. Meshkin**, 429 F. Supp. 2d 479 (D. Conn. 2006); **SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr.**

16

in dicta that, if Utah law applied, individual liability might be found. But liability was found under the federal Racketeer Influenced and Corrupt Organizations Act (RICO). **Young**, 92 Fed. Appx. at 392. A Texas court has held that an LLC's veil may be pierced when it has been used "as a sham to perpetrate a fraud." **McCarthy**, 251 S.W.3d at 590-91. The LLC at issue was used as a "front" and purposefully was kept undercapitalized and unable to pay its creditors. **Id.** at 591. Here, no such evidence was presented regarding Gant-Shivers, and no evidence was presented of Shivers participating personally in any representations to the Grand parties.

¶34. The law of Delaware, as applied by its own courts and those of other jurisdictions, "allows a court to pierce the corporate veil of an entity when there is fraud . . . ."[3] However, the trial court applied a Mississippi statute. Thus, Delaware's business-association law, however persuasive, does not lead to a finding of error.

¶35. We find no error in the grant of Shivers's separate summary judgment motion.

## CONCLUSION

¶36. The judgment of the Circuit Court of the First Judicial District of Harrison County is affirmed.

¶37. **AFFIRMED.**

---

**Props.**, 375 F. Supp. 2d 238 (S.D. N.Y. 2005); **Taurus IP, LLC v. DaimlerChrysler Corp.**, 534 F. Supp. 2d 849 (W.D. Wis. 2008) (applying outdated Texas law; an expired statute and an overruled case); **Westmeyer v. Flynn**, 889 N.E.2d 671 (Ill. Ct. App. 2008); **McCarthy v. Wani Venture, A.S.**, 251 S.W.3d 573 (Tex. App. 2007).

[3] **Westmeyer**, 889 N.E.2d at 677 (quoting **In re Kilroy**, 357 B.R. 411, 425 (Bankr. S.D. Tex. 2006)). *See* **Meshkin**, 429 F. Supp. 2d at 504; **SR Int'l Bus.**, 375 F. Supp. 2d at 243; **Geyer v. Ingersoll Publ'ns Co.**, 621 A.2d 784, 793 (Del. Ch. 1992).

**WALLER, C.J., CARLSON AND DICKINSON, P.JJ., LAMAR, KITCHENS, CHANDLER AND KING, JJ., CONCUR. PIERCE, J., NOT PARTICIPATING.**